[No. B160114. Second Dist., Div. Four. Aug. 7, 2003.]

ARCH WOODLIFF, Plaintiff and Appellant, v.
CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, Defendant
and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

[*]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part B of the discussion.

## Counsel

Law Office of Lorraine M. Walsh and Lorraine M. Walsh for Plaintiff and Appellant.

Thomas & Elliott, Stephen L. Thomas, Jay J. Elliott; Benedon & Serlin, Gerald M. Serlin; Irell & Manella and Harry J. Schulz; Paul, Hastings, Janofsky & Walker, Ronald M. Oster; Howrey, Simon, Arnold & White, Kirk A. Pasich; Munger, Tolles & Olson, Cary B. Lerman; Law Offices of Glenn A. Brown, Jr., Glenn A. Brown, Jr.; Prenovost, Normandin, Bergh & Dawe and Michael G. Dawe; The Ford Law Firm and William H. Ford III as Amici Curiae on behalf of Plaintiff and Appellant.

Black, Compean & Hall, Frederick G. Hall and Daniel Eli for Defendant and Respondent.

OPINION

**VOGEL (C. S.), P. J.—**

## INTRODUCTION

This appeal raises a question of the first impression about the obligation of the California Insurance Guarantee Association (CIGA). The specific issue is whether CIGA is required to pay the claim of an insured of an insolvent insurer when the claim is based upon a judgment the insured obtained against the insurer prior to insolvency for breach of the contractual duty to defend. The judgment reflects the amount the insured paid for legal representation to defend himself after the insurer declined his tender.

CIGA contended, and the trial court agreed, that it had no obligation to pay based upon subdivision (h) of Insurance Code section 1063.2.[1] That provision provides: " 'Covered claims' [for which CIGA is liable] shall not include any loss adjustment expenses, including adjustment fees and expenses, attorney fees and expenses, court costs, interest, and bond premiums, incurred prior to the appointment of a liquidator [for the insolvent insurer]." In a nutshell, CIGA's position and that of our dissenting colleague is that because the insured's judgment is to compensate him for attorney fees he incurred before the insurer became insolvent, the judgment and therefore the claim presented to CIGA is the functional equivalent of a claim for loss adjustment expenses for which CIGA is not liable.

We reject CIGA's analysis. The insured's judgment against the insurer is not a loss adjustment expense. In the insurance industry, the phrase "loss adjustment expenses" generally means the expense incurred by the insurer to investigate and settle a claim. Simply stated, an insured does not incur loss adjustment expenses because the insured does not initiate or control the loss adjustment process. The insured's reasonable expectation is that the insurer will engage in that process. That, in fact, is one of the reasons insurance is obtained. Consequently, when, as here, an insured is faced with a refusal to defend by its insurer and thereafter first retains counsel to defend and later obtains a judgment against the insurer to compensate for damages caused by breach of the contractual duty to defend—damages that can include compensation for monies spent on attorney fees—the insured's judgment against the insurer cannot reasonably be categorized as one for "loss adjustment expenses." Instead, it reflects compensation awarded to the insured by a court based upon the insurer's failure to provide a key benefit owed to him under the insurance policy: legal representation. Because we conclude the exclusion

---

[1] All subsequent undesignated statutory references are to the Insurance Code.

in section 1063.2, subdivision (h) does not apply, CIGA is obligated to pay the insured's claim since, as conceded by CIGA, the insured's judgment otherwise falls within the statutory definition of a "covered claim." We therefore reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Arch Woodliff owned an apartment building. In 1994, he purchased a commercial property liability insurance policy from LMI Insurance Company (LMI).[2]

The policy was in effect in 1995 when two actions were brought against Woodliff for violation of the federal Fair Housing Act. The actions alleged discrimination "on the basis of familial status." The actions sought a declaration that Woodliff's actions were in violation of law, an award of compensatory and punitive damages to the discriminated families, and injunctive relief against further discrimination.

Woodliff tendered defense of the action to LMI. He relied upon the provision that LMI would insure him against all claims made based upon his operation and management of the apartment building. LMI declined to defend. Although the reasons for LMI's decision are not found in this record, CIGA conceded at oral argument on this appeal that LMI improperly denied a defense to Woodliff.

Woodliff retained counsel to defend against the federal actions. The actions were settled when Woodliff agreed to build a children's playground in the apartment complex. The settlement did not require Woodliff to pay any money to the plaintiffs. Woodliff incurred attorney fees in defending against these actions.

In 1997, Woodliff sued LMI, alleging three causes of action. The first was for breach of contract. Woodliff alleged the two federal actions raised claims within the policy's coverage so that LMI's refusal to defend was a breach of contract. The second was for breach of the covenant of good faith and fair dealing. He alleged LMI "refused without good cause to provide coverage and a defense to [him] despite the existence of facts indicating potential coverage." The third, for negligent infliction of emotional distress, alleged Woodliff suffered foreseeable emotional distress because of LMI's failure to defend. For the cause of action for breach of contract, Woodliff sought reimbursement for the attorney fees and costs he had expended to defend

---

[2] On May 8, 2003, Woodliff filed a motion to augment the record to include a complete copy of the LMI policy. CIGA has not opposed the motion. The motion is granted.

against the federal lawsuits. For the causes of action for breach of the covenant of good faith and fair dealing and negligent infliction of emotional distress, Woodliff sought damages "according to proof."

In 1999, a court trial was conducted on Woodliff's action against LMI. Woodliff prevailed in part. The court's judgment provides: "No breach of covenant of good faith and fair dealing. Hence, no 'Brandt fees' and no damages. No proof of emotional distress damages. Inadequate proof and no evidence of any such damages over and above what would have been incurred had defendant [LMI] provided a defense under a reservation of rights. *Plaintiff Archie Woodliff is entitled to judgment against [LMI] for breach of contract.*" (Italics added.) The court awarded Woodliff $47,386 plus interest, representing the attorney fees and costs Woodliff had incurred as a result of LMI's failure to defend him in the federal actions.[3]

In 2000, LMI declared insolvency prior to paying Woodliff's judgment.[4] Woodliff tendered payment of his judgment against LMI to CIGA. CIGA denied any obligation to pay the judgment.

Woodliff sued CIGA for declaratory relief. The parties filed cross-motions for summary judgment based upon stipulated facts. Both motions raised the same legal issue: Did Woodliff's claim fall within the statutory exclusion found in section 1063.2, subdivision (h)?

Insofar as is relevant to this appeal, the trial court ruled in favor of CIGA as follows:

"The sole issue in dispute is the interpretation of Ins. Code 1063.2(h). As a statutory entity, CIGA's duties are expressly defined by the Insurance Code. The Insurance Code defines 'covered claims' and specifically excludes certain obligations for which the insolvent insurer would otherwise be liable. Ins. Code 1063.2(h) excludes loss adjustment expenses, including attorneys' fees. In 1981, the statutory language was amended, deleting the words 'adjustment

---

[3] As will be explained later in more detail in the nonpublished portion of this opinion, the judgment was subject to an order that $6,188.17 be used to satisfy an outstanding claim for attorney fees Woodliff owed to counsel who had defended him in the two federal actions. If that claim was barred by the statute of limitations, Woodliff was to return the $6,188.17 to LMI. Woodliff's entitlement to the $6,188.17 is an issue discussed in the nonpublished portion of this opinion.

[4] On April 28, 2003, Woodliff filed a motion to augment the record on appeal to include documents indicating he had filed a claim with the liquidator for LMI and that the liquidator apparently suggested he present the claim to CIGA for payment. The motion is denied. The documents were not presented to the trial court and are not relevant to the question of law raised by this appeal.

expense and attorneys' fees incurred by the insolvent insurer' and inserting the language 'any loss adjustment expense, court costs, interest and bond premiums incurred.'

"Covered claims are not co-extensive with an insolvent insurer's obligations under its policies. [Citation.] For example, CIGA's duty to defend is more limited than an insurer's duty. [Citation.]

"[¶] … [¶]

"[T]he fees are expressly excluded by the statutory exception set forth in Ins. Code 1063.2(h). Plaintiff argues that because he and not LMI incurred the attorneys' fees, the claim does not fall within the exception set forth in the Ins. Code 1063.2(h). However, the above statutory amendment makes it clear that attorneys' fees are excluded regardless of who incurs them.

"[¶] … [¶]

"As Defendant has established that attorneys' fees are excluded from coverage pursuant to Ins. Code 1063.2(h), Defendant's Motion for Summary Judgment is granted."

This appeal by Woodliff follows.

## DISCUSSION

### A. Woodliff's Claim Is a "Covered Claim" Within the Meaning of Statutory Law

The Courts of Appeal have summarized the history of CIGA and its general principles as follows:

"CIGA was created in 1969 as a compulsory association of state-regulated insurance companies. ([Citation]; §§ 1063.14; 1063, subd. (a).) Its purpose is 'to provide insurance against loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies.' [Citation.] CIGA assesses its members when another member becomes insolvent, thereby establishing a fund from which insureds whose insurers become insolvent can obtain financial and legal assistance. [Citation.] Member insurers then recoup assessments paid to CIGA by means of a surcharge on premiums to their policy holders. (§ 1063.14, subd. (a).) In this way the insolvency of one insurer does not impact a small segment of insurance consumers, but is spread throughout the insurance consuming public, which in effect subsidizes CIGA's continued operation.

"While CIGA's general purpose is to pay the obligations of an insolvent insurer, it is not itself an insurer and 'does not "stand in the shoes" of the insolvent insurer for all purposes.' [Citation.] 'CIGA is *not* in the "business" of insurance .... CIGA issues no policies, collects no premiums, makes no profits, and assumes no contractual obligations to the insureds.' [Citation.] Rather it is authorized by statute to pay only 'covered claims' of an insolvent insurer, those determined by the Legislature to be in keeping with the goal of providing protection for the insured public. (§ 1063.2, subd. (a).)" (*R. J. Reynolds Co. v. California Ins. Guarantee Assn.* (1991) 235 Cal.App.3d 595, 599–600 [1 Cal.Rptr.2d 405].)

" 'Since "covered claims" are not coextensive with an insolvent insurer's obligations under its policies, CIGA cannot and does not " 'stand in the shoes' of the insolvent insurer for all purposes." [Citation.] Indeed, CIGA is "expressly forbidden" to do so except where the claim at issue is a "covered claim." [Citation.] It necessarily follows that CIGA's first duty is to determine whether a claim placed before it is a "covered claim." ' [Citation.]" (*Industrial Indemnity Co. v. Workers' Comp. Appeals Bd.* (1997) 60 Cal.App.4th 548, 557 [70 Cal.Rptr.2d 295].)"

Section 1063.1, subdivision (c)(1) contains the general definition of a covered claim. It provides, in pertinent part: " 'Covered claims' means the obligations of an insolvent insurer, including [those] (i) imposed by law and within the coverage of an insurance policy of the insolvent insurer."[5] (See also *California Ins. Guarantee Assn. v. Superior Court* (1991) 231 Cal.App.3d 1617, 1626 [283 Cal.Rptr. 104] ["CIGA's statutory duties can best be defined by examining the contractual duties which were imposed upon the now insolvent insurer either by law or ... policy provisions"].)

On this appeal, CIGA concedes "there is no dispute that the LMI Judgment initially qualifies as a 'covered claim' as that term is defined in Insurance Code section 1063.1(c)(1)." That concession is well taken given our decision in *Aloha Pacific, Inc. v. California Ins. Guarantee Assn.* (2000) 79 Cal.App.4th 297 [93 Cal.Rptr.2d 148].

There, in regard to the requirement that a "covered claim" be "imposed by law," we held: " 'A judgment is the final determination of the rights of the parties in an action or proceeding' (Code Civ. Proc., § 577), and the phrase 'imposed by law' squarely denominates a judgment .... [¶] ... [B]y excluding

---

[5] Subdivision (c) of section 1063.1 enumerates many separate categories of claims clearly within the coverage of an insurance policy of an insolvent insurer but which nevertheless are not "covered claims." None of these categories is applicable to this case.

from the primary definition of covered claims a default or stipulated judgment against the insolvent insurer,[6] the Legislature necessarily determined that a judgment obtained in an adversary setting would constitute an obligation imposed by law." (*Aloha Pacific, Inc. v. California Ins. Guarantee Assn., supra*, 79 Cal.App.4th at p. 309.)

In regard to the requirement that a "covered claim" be "within the coverage of the insurance policy of the insolvent insurer," we concluded the latter phrase "to mean within the risks of loss protected against by an insurance policy. Thus the reading of the pertinent portion of subdivision (c)(1) would be: the obligations of an insolvent insurer within the risks of loss protected against by an insurance policy of the insolvent insurer." (*Aloha Pacific, Inc. v. California Ins. Guarantee Assn., supra*, 79 Cal.App.4th at p. 311, fn. omitted.)

Particularly relevant to this appeal is the principle that "[s]tandard comprehensive or commercial general liability policies ... provide that the insurer has a duty to defend the insured in any action brought against the insured seeking damages for any covered claim. It has been stated that, so far as the insured is concerned, the duty to defend may be as important as the duty to indemnify." (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 45 [65 Cal.Rptr.2d 366, 939 P.2d 766], fn. omitted.) That is, "[a]n insured buys liability insurance in large part to secure a defense against *all* claims potentially within policy coverage, even frivolous claims unjustly brought." (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1086 [17 Cal.Rptr.2d 210, 846 P.2d 792].) Consequently, an insurer's failure to defend a claim can constitute a breach of contract for which the insurer can be liable for the insured's attorney fees, litigation expenses, settlement costs, and the judgment entered against the insured. (See, e.g., *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791–792 [244 Cal.Rptr. 655, 750 P.2d 297], and *State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co.* (1970) 9 Cal.App.3d 508, 528 [88 Cal.Rptr. 246].)

The policy LMI issued to Woodliff provided LMI had "the right and duty to defend any 'suit' seeking [specified] damages." Consequently, one of the risks from which Woodliff sought protection by purchasing the LMI policy was the need to mount a legal defense to claim(s) potentially within the policy's coverage. That exactly is the risk that materialized. As the trial court

---

[6] At this point we were referring to section 1063.2, subdivision (g), which provides, in pertinent part: "[N]or shall any default judgment or stipulated judgment against the insolvent insurer, or against the insured of the insolvent insurer, be binding against [CIGA]." The purpose of this restriction "is to protect CIGA against collusion and to require simply that the validity of any claim be determined in an adversary setting before being reduced to a judgment which CIGA must honor." (*Biggs v. California Ins. Guarantee Assn.* (1981) 126 Cal.App.3d 641, 645 [179 Cal.Rptr. 16].)

decided in 1999 in rendering judgment in Woodliff's favor on his breach of contract action against LMI based on a claim of a failure to defend, claims potentially covered by LMI's policy were made but LMI failed to defend, forcing Woodliff to retain counsel at his own expense.

The dispositive issue is whether, as CIGA contends, the LMI judgment is excluded from being a statutory claim by virtue of section 1063.2, subdivision (h).[7] ▉ Interpretation of a statute is a question of law. We are not bound by the trial court's interpretation. We examine the issue de novo. (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531 [85 Cal.Rptr.2d 257, 976 P.2d 808].)

Because subdivision (h), like all statutory provisions, must be read in context, we first set forth the language of subdivision (a) of section 1063.2. (See, e.g., *DeYoung v. City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722].) Subdivision (a) provides CIGA "shall pay and discharge covered claims and in connection therewith pay for or furnish loss adjustment services and defenses of claimants when required by policy provisions." Subdivision (h), in turn, limits the obligation to pay loss adjustment expenses. Subdivision (h) provides: " 'Covered claims' shall not include any loss adjustment expenses, including adjustment fees and expenses, attorney fees and expenses, court costs, interest, and bond premiums, *incurred prior to the appointment of a liquidator*." (Italics added.)

CIGA argued, and the trial court agreed, that Woodliff's judgment was the functional equivalent of a claim for attorney fees incurred as a loss adjustment expense prior to LMI's liquidation and therefore was not a covered claim within the meaning of section 1063.2, subdivision (h). This is also the position taken by our dissenting colleague. We respectfully disagree with this position because we believe it is based upon an incorrect interpretation of the phrase "loss adjustment expenses."

As the dissent notes, "the term 'loss adjustment expense' is generally understood to refer to attorney fees and expenses incurred by the carrier in either defending or settling claims against the insured." (Dis. opn., *post*, p. 1709.)

---

[7] The dissent states Woodliff cites and relies upon section 1063.2 for the proposition CIGA has a duty to pay his claim. We read Woodliff's brief differently. For instance, Woodliff states: "The central issue on appeal is whether the LMI Judgment which Woodliff obtained as a result of LMI's breach of its contractual obligations to provide a defense is a covered claim under Insurance Code § 1063.1(c)(1) or whether it is excluded under Insurance Code § 1063.2(h)." As noted, CIGA has consistently conceded the claim is a covered claim within the meaning of section 1063.1, subdivision (c)(1), a concession with which the dissent does not take issue.

All of the references we have found support this conclusion.[8] For instance, in *Planet Ins. Co. v. Mead Reinsurance Corp.* (9th Cir. 1986) 789 F.2d 668, an excess insurer filed a declaratory relief action to construe the meaning of various policy provisions. One provision at issue was a clause that excluded "loss adjustment expenses" from "Ultimate Net Loss." ██ In construing this provision, the court noted: "The term, 'adjustment of losses,' means the process of ascertaining the value or amount of a loss or negotiating a compromise or settlement." (*Id.* at p. 672, citing 6 Appleman (1972) *Insurance Law and Practice,* § 3971.) Consequently, loss adjustment expenses are generally defined as the costs *incurred by the insurer* in defending and/or settling the claim. The expenses can include payment to attorneys, investigators, experts, outside adjusters, and court reporters. (See *State Farm Mutual Automobile Ins. Co. v. Quackenbush* (1999) 77 Cal.App.4th 65, 72–73 [91 Cal.Rptr.2d 381]; see also *Glossary of Insurance and Risk Management Terms* (8th ed. 2001) p. 116 [defining "loss adjustment expense" as: "The cost of investigating and adjusting losses"]; *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 250 [32 Cal.Rptr.2d 807, 878 P.2d 566] [administrative regulation promulgated to implement Prop. 103 that refers to "allocated loss adjustment expenses" means "the costs associated with the adjustment of specific claims"]; *Beneficial etc. Ins. Co. v. Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 520 [297 P.2d 428] [contract between insurer and insurance agency defined "loss adjustment expense" as the insurer's " 'allocated' overhead cost ... in the adjustment of each claim"]; and 14 Holmes' Appleman on Insurance 2d (1999) Glossary of Reinsurance Terminology, ch. 102, p. 63 [defining "loss adjustment expense" as "[t]he expense incurred by the ceding insurer in the defense and settlement of claims under its policies but not the insurer's overhead expenses"].)

The bone of contention is whether the term "loss adjustment expenses" in section 1063.2, subdivision (h) also refers to expenses incurred by the insured after the insurer improperly refuses to defend. Neither CIGA nor the dissent offers any authority to support the position that it does. We will conclude the phrase "loss adjustment expenses" does not embrace the factual matrix presented on the appeal. At the outset, we note a significant fact: the insured (Woodliff) obtained a judgment against the insurer for breach of contract for failing to defend and was awarded damages to compensate him for the loss caused by the failure to defend. Because the claim Woodliff presented to CIGA is predicated upon a final judgment he obtained against the insurer, this case does not present the question of whether CIGA would be required to pay if an insured simply tendered a bill from an attorney the insured had retained. ██ Our holding is therefore limited to the situation presented here: a claim made to CIGA after there has been a judicial adjudication the insurer had

---

[8] The dissent correctly notes no case has interpreted that phrase in the context of section 1063.2. (Dis. opn., *post,* p. 1709, fn. 2.)

breached its contractual duty to defend and an award of compensatory damages based upon that finding.

We first examine the language of section 1063.2. ■ Subdivision (a) of the statute provides if a claim presented by the insured to CIGA falls within the statutory definition of a covered claim so that CIGA is required to defend, CIGA is required to "pay for or furnish loss adjustment services" ancillary to that defense. However, subdivision (h) then limits CIGA's obligation to pay for loss adjustment expenses to those incurred after CIGA has become involved. Loss adjustment expenses incurred *before* a liquidator has been appointed for the now-defunct insurer are specifically excluded from the scope of a "covered claim." In other words, CIGA has no obligation for loss adjustment expenses, including attorney fees, incurred to defend the insured *before* the insurer became insolvent and a liquidator was appointed. As explained below, subdivision (h) simply represents a legislative rejection of a proposal to render CIGA liable for loss adjustment expenses incurred by the insurer before insolvency.

When viewed in this context, section 1063.2, subdivision (h) does not support CIGA's argument. Woodliff's claim presented to CIGA was not a claim from a creditor of LMI (e.g., a law firm, outside adjuster, investigator) who had incurred expenses to help defend Woodliff prior to LMI's insolvency. Instead, the claim was a judgment entered against LMI following a trial in which the court had found LMI had breached its contract with Woodliff by failing to defend him. ■ The mere fact the judgment amount is based upon the attorney fees Woodliff incurred in defending after LMI declined his tender and before LMI became insolvent and a liquidator was appointed does not transform Woodliff's claim into a demand for payment of loss adjustment expenses. The key point is that the judgment compensates Woodliff for a benefit under the LMI policy denied to him by LMI: a defense against a covered claim.

To a certain extent, CIGA attempts to avoid the force of this conclusion by relying upon some legislative history to subdivisions (a) and (h) of section 1063.2. This approach is not persuasive. ■ For one thing, in determining the Legislature's intent in enacting a statute, we first look to the words of the statute itself and give those words their usual and ordinary meaning. We only consult legislative materials when the words of a statute are susceptible of more than one reasonable construction. (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744 [38 Cal.Rptr.2d 650, 889 P.2d 970].)

The language of section 1063.2, subdivision (h) is clear: CIGA is not required to pay loss adjustment expenses incurred prior to the insurer's insolvency. This furthers the policy behind CIGA of creating an institution

that can fulfill the function of providing relief to the insureds of an insolvent insurer because it exempts from CIGA's obligation any requirement to pay third party vendors such as attorneys, investigators, etc., who had rendered services prior to the insurer's insolvency.

In any event, the material relied upon by CIGA does not support a contrary conclusion. CIGA first notes a bill was introduced in 1970: (1) to amend subdivision (a) of section 1063.2 to require CIGA to pay "loss adjustment services [and] any reasonable necessary defense expenses remaining unpaid on the date of the [insurer's] insolvency"; and (2) to add subdivision (h) which would read: " 'Covered claims' shall include adjustment expense and attorney's fees incurred by the insolvent insurer prior to the appointment of a liquidator." CIGA then notes the Legislature rejected these amendments and, instead, amended section 1063.2, subdivision (a) to provide, as it presently reads, CIGA "shall pay and discharge covered claims and in connection therewith pay for or furnish loss adjustment services and defenses of claimants when required by policy provisions." The earlier language requiring CIGA to also pay "reasonable and necessary defense expenses remaining unpaid on the date of the insolvency" had been deleted. Subdivision (h) to section 1063.2 had been amended to include the word "not" so it then read: " 'Covered claims' shall *not* include adjustment expense and attorney's fees incurred by the insolvent insurer prior to the appointment of a liquidator." (Italics added.)

This legislative decision to reject the proposal CIGA pay preliquidation loss adjustment expenses does not support CIGA's present position that it has no obligation to Woodliff's judgment against LMI. The Legislature simply determined to limit CIGA's financial responsibility by deleting any responsibility for costs incurred by the insurer prior to insolvency. This distinction has a sound policy basis. As the Michigan Supreme Court explained in rejecting the claims of attorneys for services rendered prior to the insolvency of three insurers as being outside the scope of Michigan's version of CIGA:[9] "The act is designed to protect from potentially catastrophic loss persons who have a right to rely on the existence of an insurance policy—the insureds and persons with claims against the insureds. Persons in such categories are relatively helpless with regard to the insolvency of an insurer. They are not likely to be in a position to evaluate the financial stability of the insurance company and they have no control over the time at which their claims arise. Other creditors of the insurance companies, such as attorneys, have an

---

[9] In Michigan, the entity is called the Michigan Property and Casualty Guaranty Association. It was established pursuant to the Property and Casualty Guaranty Association Act. Its statutory duty is "to pay obligations of insolvent insurers which come within the act's definition of 'covered claims.' " (*Metry, Metry, Sanom & Ashare v. Mich., etc.* (1978) 403 Mich. 117 [267 N.W.2d 695, 696].)

ongoing relationship with the company and can presumably judge its financial position. Further, they are in a position to protect themselves from the serious consequences of an insurance company's insolvency by negotiating appropriate provisions in their contracts regarding the frequency of billing and payment." (*Metry, Metry, Sanom & Ashare v. Mich., etc., supra,* 267 N.W.2d at p. 697.) The Ohio Court of Appeals reached a similar conclusion in *Ohio Ins. Guar. Ass'n v. Simpson* (1981) 1 Ohio App.3d 112 [1 Ohio B. 418, 439 N.E.2d 1257]. There the question was whether the Ohio Insurance Guaranty Association was liable to an attorney for services he had provided to an insurance company before its insolvency. The court concluded the claim was not a covered claim within the meaning of the statutory scheme because the purpose of the law was "to protect policyholders and persons who had claims against the policyholders, not general creditors of insolvent insurance companies. [The attorney's claim] does not arise out of any insurance policy; instead, it arises out of his contract with [the insurer] for legal services." (*Id.,* 439 N.E.2d at p. 1259.) ▪ We therefore conclude that nothing in our state Legislature's decision to exempt CIGA from liability for preinsolvency expenses suggests it sought to exempt from CIGA's liability a claim based upon a judgment an insured recovered from the insurer for failing to defend. It merely sought to deny access to CIGA's financial resources to third party creditors of an insolvent insurer.

CIGA next points to a 1981 amendment of subdivision (h) of section 1063.2. The amendment had two aspects. First, the language "incurred by the insolvent insurer" was deleted. Second, the definition of loss adjustment expenses was expanded. (Stats. 1981, ch. 1154, § 2, p. 4614.) As so amended, the provision now reads (as set forth earlier in this opinion): " 'Covered claims' shall not include any loss adjustment expenses, including adjustment fees and expenses, attorney fees and expenses, court costs, interest, and bond premiums, incurred prior to the appointment of a liquidator."

From this CIGA argues: "[T]he Legislature clearly expressed an intent to exclude from CIGA's obligations any pre-liquidation attorneys' fees and costs regardless of who incurred them (the insolvent insurer, the insured, or anyone else." We are not persuaded.

For one thing, nothing in the legislative history of this amendment supports such a conclusion.[10] As counsel for amici curiae noted at oral argument, there

---

[10] We asked the parties to lodge, to the extent available, legislative history about the 1981 amendment to section 1063.2. Woodliff filed more than 200 pages of material. The bulk of the material addresses other then-pending statutory amendments. None of it directly addresses the intent behind deleting the phrase "incurred by the insolvent insurer" from subdivision (h). Instead, the legislative history simply indicates that given that CIGA's purpose is to pay covered claims presented by policyholders and third party claimants and that CIGA has limited

is a more pragmatic explanation for the amendment: the elimination of a redundancy since, as explained earlier at pages 1700–1701, loss adjustment expenses are generally interpreted to mean expenses incurred by the insurer, not the insured.

In any event, the analytical flaw with CIGA's argument is that it continues to equate a judgment obtained by an insured against the insurer for refusal to defend with "preliquidation attorneys' fees and costs." As explained earlier, the two are not the same. In other words, this is not the situation in which the insured has presented CIGA with a bill for services rendered prior to insolvency by a third party (e.g., an attorney) in regard to a claim under the insurer's policy.[11] Instead, this is a situation in which the insurer failed to defend when it should have, the insured incurred attorney fees, and the insured recovered a judgment for the damages caused by the contractual failure to defend. Woodliff's claim to CIGA is one made by a policyholder for policy benefits due but not paid by the now insolvent insurer.

The dissent's response to our analysis is that a literal reading of section 1062.3, subdivision (h) requires rejection of Woodliff's argument. Literally applied the dissent's conclusion is understandable. However, realistically such a conclusion is not acceptable. ■ A cardinal rule of statutory construction is that a literal meaning of a statute may be disregarded to avoid an absurd result. (See *California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340 [33 Cal.Rptr.2d 109, 878 P.2d 1321]; *Wells Fargo Bank v. Superior Court* (1991) 53 Cal.3d 1082, 1098 [282 Cal.Rptr. 841, 811 P.2d 1025]; *County of Sacramento v. Hickman* (1967) 66 Cal.2d 841, 849, fn. 6 [59 Cal.Rptr. 609, 428 P.2d 593].) We believe it would be absurd to deny Woodliff recovery from CIGA for a benefit of his policy simply because his claim represents the amount spent on legal representation. For instance, if Woodliff either had to pay money to settle the two federal actions or if he had chosen not to retain counsel but instead defended himself in propria persona and a judgment was rendered against him, he could have also recovered either of those sums as damages in a breach of contract action against LMI. A request to CIGA to pay a claim based upon a judgment for either of those amounts would not have fallen within the exclusionary ambit of subdivision (h)'s bar on recovery of "loss adjustment expenses." The fact Woodliff incurred no damages other than attorney fees and related costs should not result in CIGA being able to deny what it otherwise concedes is a "covered claim." It would constitute an absurd result to exempt CIGA from liability

financial resources, all pre-insolvency loss adjustment expenses should be treated as general creditor claims to be paid through the liquidation process rather than from CIGA.

[11] As explained earlier, we need not and do not decide whether CIGA would be required to pay if Woodliff simply presented a bill for attorney services rendered to him. Those facts are not before us.

merely because the damages recovered were the exact amount spent on legal representation. This result would be nonsensical because it would penalize the insured for having retained counsel and, in effect, would require him to forgo legal representation (an undisputed benefit of his policy with LMI) and leave himself at the mercy of the third-party claim.

Requiring CIGA to pay Woodliff's claim is consistent with CIGA's objective to protect against a " 'loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies.' [Citation.]" (*Biggs v. California Ins. Guarantee Assn., supra,* 126 Cal.App.3d 641, 644.) As set forth above, a significant portion of an insured' s reasonable expectation of coverage is that the insurer will pay to provide a defense against suits within the policy's coverage. Because CIGA is intended to protect insureds, the risk of that loss (failure to defend) should not be shifted, as CIGA essentially urges, to the insured when prior to insolvency the insured has obtained a judgment based upon the insurer's refusal to defend.[12] "Such a result runs entirely counter to the whole purpose and philosophy behind CIGA which is to *protect* insureds, not place upon them unusual risks they would not have faced if their insurer has not become insolvent." (*California Ins. Guarantee Assn. v. Superior Court, supra,* 231 Cal.App.3d at pp. 1627–1628, fn. omitted.)

Our conclusion is fortified by applying a venerable principle of statutory construction. "Under the familiar rule of construction, *expressio unius est exclusio alterius,* where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed. [Citations.]" (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537].) As CIGA points out, a two-step approach is taken to decide whether CIGA is liable on a claim. The first step is to determine whether the proffered claim is a "covered claim" as defined by section 1063.1, subdivision (c)(1). As noted earlier, CIGA properly concedes Woodliff's claim meets that statutory definition. The next step is to determine whether there is any statutory exception to exempt CIGA from liability. We have already rejected

---

[12] The fact that Woodliff's claim is based upon a final judgment rendered by the trial court predicated upon a finding LMI breached its contractual duty to defend resolves the following "parade of horribles" scenario CIGA has constructed. CIGA argues that a ruling in Woodliff's favor will "essentially create[] a loophole that will lead to abuse, and thus a waste of CIGA's limited funds .... CIGA [will be] required to pay the expressly excluded preinsolvency fees to the general creditor, as long as it does so indirectly through the insured. An attorney with such a claim will easily avoid application of the statute by simply bringing the claim in the name of his/her client, the insured. If the insured does not consent, one can readily envision a scenario where an attorney with an unpaid balance coerces the insured to institute a claim against CIGA, under the threat of an action for collection against the insured. Such an interpretation elevates form (i.e. the name in which the claim is brought) over substance (i.e. the type of expense CIGA can or cannot pay), thereby fostering abuse, collusion, coercion, and fraud." (Fn. omitted.)

CIGA's argument that the exception in subdivision (h) of section 1063.2 applies to this case. However, pertinent to this analysis is another statutory exception: subdivision (g) of section 1063.2. It states a covered claim "shall not include any judgments against or obligations or liabilities of the insolvent insurer ... resulting from alleged or proven torts." ▇ We believe that by explicitly excluding a tort judgment from the definition of a covered claim, the Legislature implicitly included judgments against the insurer grounded on other theories of law such as breach of contract for failure to defend.[13]

*Carver v. Workers' Comp. Appeals Bd.* (1990) 217 Cal.App.3d 1539 [266 Cal.Rptr. 718] is instructive on this point. There, the insurer issued a workers' compensation policy. An employee of the insured was injured at work. He first filed a workers' compensation claim and later filed, relying upon Labor Code section 5814,[14] a petition for a penalty based on the insurer's failure to make timely payments as required by law. The insurer thereafter became insolvent. In subsequent proceedings, it was conceded CIGA was required to pay the claim for workers' compensation benefits; however, the parties disputed whether CIGA was also liable for the penalty award the workers' compensation judge had issued.

CIGA relied upon the provision, now found in subdivision (g) of section 1063.2 that a "covered claim" does "not include any judgments against or obligations or liabilities of the insolvent insurer ... resulting from alleged or proven torts." The Court of Appeal rejected this argument. It held: "We do not find the fixed percentage assessed by Labor Code section 5814 to be analogous to tort damages in the civil field. We conclude that it is more in the nature of a built-in statutory method of ensuring the timely return to work of injured workers by providing an economic incentive to employers to make the payments due for prompt necessary treatment under the Labor Code. CIGA, as a creature of statute, is bound to pay all covered claims in the absence of a statutory exclusion. No tort liability was imposed on the insolvent workers' compensation carrier in the instant case, since the Board does not adjudicate tort claims. The amount at issue herein is clearly a workers' compensation benefit, not tort damages, and is not excluded section 1063.2." (*Carver v. Workers' Comp. Appeals Bd., supra,* 217 Cal.App.3d 1539, 1548, fn. omitted.)

---

[13] Pursuant to Government Code section 68081, we requested and received supplemental letter briefs on this issue.

[14] Insofar as is relevant, Labor Code section 5814 provides: "When payment of compensation has been unreasonably delayed or refused, either prior to or subsequent to the issuance of an award, the full amount of the order, decision, or award shall be increased by 10 percent.... The question of delay and the reasonableness of the cause therefor shall be determined by the appeals board in accordance with the facts."

By a parity of reasoning, Woodliff's judgment against LMI is likewise a covered claim not within any statutory exclusion. The judgment was based solely on breach of contract; the trial court, in fact, rejected the tort claim. [15] The judgment compensates Woodliff for a benefit due under the policy: costs of defense. No statutory provision exempts CIGA for liability for this claim. CIGA is therefore liable for the claim as a matter of law, rendering the trial court's grant of summary judgment to CIGA error.

### B.   A TRIABLE ISSUE OF FACT EXISTS AS TO THE AMOUNT WOODLIFF CAN RECOVER FROM CIGA[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The trial court's grant of CIGA's summary judgment motion is reversed. The trial court is directed to grant Woodliff's summary judgment motion after determining the disposition of the $6,188.17 (plus interest) that was to be held in trust to satisfy an outstanding claim from Woodliff's prior counsel. Woodliff is to recover costs on appeal.

Curry, J., concurred.

## HASTINGS, J., —

I dissent.

The facts are uncontradicted and accurately reflected in the majority opinion. I briefly summarize the pertinent facts.

Appellant, Arch Woodliff (Woodliff), seeks to collect from the California Insurance Guarantee Association (CIGA) the monetary value of a judgment he obtained against his insurance carrier, LMI Insurance Company (LMI). In 1995, LMI refused a tender of defense by Woodliff on a claim admittedly

---

[15] As we held in *Campbell v. Superior Court* (1996) 44 Cal.App.4th 1308 [52 Cal.Rptr.2d 385], an insurer's refusal to defend can also create tort liability on the theory that an unreasonable failure to defend is a breach of the implied covenant of good faith and fair dealing. On this latter theory, the insurer could be liable for tort damages not embraced in the breach of contract action such as compensation for emotional distress and punitive damages. (*Id.* at pp. 1319–1321.) (Accord, *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 881 [93 Cal.Rptr.2d 364] ["A breach of the duty to defend in itself constitutes only a breach of contract [citation], but it may also violate the covenant of good faith and fair dealing where it involves unreasonable conduct or an action taken without proper cause. [Citations.]"].)

[*]See footnote, *ante*, page 1690.

covered by a policy of insurance issued by LMI to Woodliff. As a result, Woodliff personally incurred attorney fees and costs to defend the claim. Woodliff sued LMI and in 1999 obtained the judgment for breach of contract in the amount of $47,386 plus interest, which represents the attorney fees and costs incurred by Woodliff as a result of LMI's failure to defend. In 2000, before satisfying the judgment, LMI declared insolvency and a liquidator was appointed.

Woodliff tendered his judgment to CIGA which denied the tender. It contended that the attorney fees and costs reflected in the judgment were incurred prior to insolvency of LMI and were thus not "covered claims" as defined within Insurance Code section 1063.2.[1] Woodliff filed suit against CIGA seeking declaratory relief that the judgment did qualify as a "covered claim" within section 1063.2. The parties filed cross-motions for summary judgment and the trial court agreed with CIGA and issued a ruling explaining its decision as set out in the majority opinion. I agree with the ruling by the trial court.

As pertinent, section 1063.2 states:

"(a) The association shall pay and discharge covered claims and in connection therewith pay for or furnish loss adjustment services and defenses of claimants when required by policy provisions.... [¶] ... [¶]

"(h) 'Covered claims' shall not include any loss adjustment expenses, including adjustment fees and expenses, attorney fees and expenses, court costs, interest, and bond premiums, incurred prior to the appointment of a liquidator."

The majority opinion focuses solely on the phrase "loss adjustment expense" from this section. Citing authorities interpreting the term,[2] the majority concludes that the phrase "loss adjustment expense" can only mean attorney fees and costs incurred by a carrier that accepts its duty to defend, not attorney fees and costs incurred by the insured when the carrier refuses to defend. Based on this interpretation, the majority concludes that section 1063.2 does not apply to this claim. This is a much too narrow reading of section 1063.2.

First, I have no doubt that the term "loss adjustment expense" is generally understood to refer to attorney fees and expenses incurred by the carrier in either defending or settling claims against the insured. But I do not agree with

---

[1] All further references will be to the Insurance Code unless otherwise noted.

[2] None of the authorities cited interpret the term in connection with the statutory language of section 1063.2.

the conclusion that the phrase can refer only to attorney fees and costs when they are incurred by the carrier. Here, the insured incurred the "loss adjustment expense" LMI would have incurred had it not refused tender of the defense. Except for the authorities cited for the general proposition of what that phrase references, the majority cites no authority to support the distinction drawn between expenses incurred by the carrier and expenses incurred by the insured when the carrier refuses a tender of defense.

Based on its interpretation of the phrase "loss adjustment expense," the majority concludes that section 1063.2 has no application to this case. But it is section 1063.2, subdivision (a), which appellant cites and relies on for the proposition that CIGA has a duty to pay the judgment. I agree with appellant that section 1063.2 is the authority that controls the outcome of this case. I must admit I am at a loss to understand why the majority concludes that section 1063.2 has no application to the case.

The obligations of CIGA are limited to those legislatively mandated under sections 1063.1and 1063.2. (*Industrial Indemnity Co. v. Workers' Comp. Appeals Bd.* (1997) 60 Cal.App.4th 548, 556–557 [70 Cal.Rptr.2d 295].) "CIGA is authorized only to 'pay and discharge covered claims.' (Ins. Code, § 1063.2, subd. (a).) It is only *'in connection therewith'* that CIGA is to 'pay for or furnish loss adjustment services and defenses of claimants *when required* by policy provisions ....' (*Ibid.*, italics added.)" (*Saylin v. California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 262 [224 Cal.Rptr. 493].)

CIGA admits that the underlying claim made by Woodliff, upon which he demanded a defense from LMI, was a "covered claim" under the provisions of the LMI policy and within the meaning of section 1063.1. The majority recognizes this concession and recognizes that the claim meets the definition of "covered claim" within section 1063.1. But it is section 1063.2 that delineates the duties CIGA must provide when a claim falls within section 1063.1. (*Saylin v. California Ins. Guarantee Assn., supra,* 179 Cal.App.3d at p. 262.) The duties include payment of "loss adjustment expenses" in connection with "covered claims," but excludes from the definition of "covered claim" "loss adjustment expenses, including adjustment fees and expenses ... *incurred prior to the appointment of a liquidator.*" (§ 1063.2, subd. (h), italics added.) The judgment here was rendered prior to the date the liquidator was appointed and reflects attorney fees and costs incurred prior to that date.

The majority discusses legislative history in connection with its opinion. To me, section 1063.2 is unambiguous and does not require resort to the rules of legislative interpretation. But assuming for sake of argument that the majority is correct that the reference to "loss adjustment expenses" in section 1063.2,

subdivision (h) should be interpreted to mean expenses incurred only by the carrier, the majority ignores the remaining language of subdivision (h). After the phrase "loss adjustment expenses, including adjustment fees and expenses," subdivision (h) lists "attorney fees and expenses [and] court costs."

"We begin with the fundamental rule that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining such intent '[t]he court turns first to the words themselves for the answer.' [Citation.] We are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.] 'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' [Citations.] 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]" (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230–231 [110 Cal.Rptr. 144, 514 P.2d 1224].)

Reviewing the language of sections 1063.1and 1063.2 together, and in the context of the overall CIGA legislation, the only reasonable conclusion I can draw is that the judgment, reflecting attorney fees, expenses and costs incurred for defense of a covered claim, but prior to liquidation, does not qualify as a covered claim. I would affirm the summary judgment in favor of CIGA.

A petition for a rehearing was denied September 4, 2003, and respondent's petition for review by the Supreme Court was denied November 12, 2003. Kennard, J., was of the opinion that the petition should be granted.